J. Evan Shapiro (SBN 218481)
eshapiro@taulersmith.com
Camrie Ventry (SBN 355853)
cventry@taulersmith.com
TAULER SMITH LLP
626 Wilshire Boulevard, Suite 550
Los Angeles, California 90017
Tel: (213) 927-9270

*Attorneys for Plaintiff Eliabeth Haviland*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH HAVILAND, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>vs.<br><br>STATE AND LIBERTY CLOTHING COMPANY, LLC, a Michigan limited liability company; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR USE OF A TRAP AND TRACE DEVICE IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); INTRUSION UPON SECLUSION** |

CLASS ACTION COMPLAINT

## INTRODUCTION

1.    Defendant State and Liberty Clothing Company, LLC ("Defendant" or "S/L"), a nationwide clothing online and brick-and-mortar retailer uses data broker software on its website – http://stateandliberty.com/  (the "Website") – to secretly collect data about a Website visitor's computer, location, and browsing habits.  The data broker software then compiles this data and correlates that data with extensive external records it already has about most Californians in order to learn the identity of the Website user.  In addition, Defendant and the Website utilize software owned by the social media platform-operating entities X Corp. (formerly Twitter) and Meta (formerly Facebook) that operates in a substantially similar manner.  Both Defendant and the third-party data collectors involved benefit commercially and financially from this surveillance.  The surveillance and collected user data are used to target Website visitors for specific marketing, among other things.

2.    Defendant's installation and use of data broker software, and code supplied by Twitter/X and Meta, without obtaining consent or authorization therefore violated California Penal Code § 638.51, California's Trap and Trace Law and duties Defendant owed to Plaintiff and other visitors to the Website similarly situated under applicable common law.

## JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class.  Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

4.    Defendant S/L is a Michigan limited liability company that maintains *6 retail locations in California, in the following cities: Los Angeles, La Jolla, Manhattan Beach, Newport Beach, Walnut Creek and Roseville.*  Plaintiff's claims

herein relate to those sales, as Plaintiff alleges that Defendant installs the surveillance code at issue for the purpose of engaging in targeted marketing of individuals who, like Plaintiff, visit the Website. Defendant is motivated to engage in such marketing – with the assistance of social media companies including X Corp. and Meta (Facebook/Instagram).

5.    The Website contains California-specific content related to Defendant's 6 California locations and the availability of specific products sold by Defendant available at those locations.

6.    Defendant maintains ongoing commercial relationships with such California customers and residents.  Defendant derives substantial revenue from California-based transactions through its operation of the Website.  Defendant deliberately reaches out to persons browsing the internet from locations in California, availing itself of its opportunity to conduct business in California through the Website. Defendant intended and understood that such persons would suffer injury in California.

7.    Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; and (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District.

**PARTIES**

8.    Plaintiff Elizabeth Haviland ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California residing and located within the Eastern District of California.  Plaintiff maintains reasonable expectations of privacy when browsing websites.

9.    Defendant is a Michigan limited liability company that owns, operates, and/or controls http://stateandliberty.com/ (the "Website") and six (6) California

retail locations.  Through the Website, and its office locations, S/L provides staffing and business consulting services, and recruits individuals to fill positions at S/L's business clients.   A recent estimate of its annual revenue

10.    Defendant runs marketing and recruiting campaigns on social media platforms including Facebook and Instagram, owned by Meta, and on information and belief, X (formerly Twitter), owned by X Corp.  These platforms utilize visitor data – collected by their software that advertising companies such as Defendant install on their websites – for targeting advertising benefitting both the advertisers and the platforms.

11.    For example, a search conducted on February 25, 2026 revealed 310 social media campaigns run by Defendant on Meta platforms Facebook and Instagram. A PDF printout of the search results are appended hereto as Exhibit A.

12.    Plaintiff identifies DOE Defendants 1 through 10 as unknown entities that Defendant directed and controlled to participate in implementing or maintaining Defendant's system. Plaintiff will seek leave to amend this Complaint to identify these entities when Defendant's discovery responses reveal their true names and roles.

13.    Each DOE Defendant acted as Defendant's agent or employee in Defendant's implementation of the surveillance scheme described herein. Each DOE Defendant operated within the scope of its relationship with Defendant and participated with Defendant in the common plan to unlawfully track California residents for Defendant's commercial gain.

## FACTUAL ALLEGATIONS

14.    Defendant is the proprietor of the Website.

15.    The Website, like most other websites, due to code or software programs running on the Website, determines the state and sometimes the city in which its visitors are located – between the time a visitor requests to go to the Website (through clicking a link or typing its address into the browser address bar),

and the time the Website loads on the visitors' screens. This location gathering occurs separately and apart from the Data Broker software and the social media platform code running on the Website that forms the basis of Plaintiff's claims in this action.

16.    On September 8, 2025, Plaintiff visited the Website. When she did, data that reasonably likely identified her were transmitted to at least three (3) third parties who used and profited that data, along with Defendant: Criteo, Quantcast, Neustar, Meta and X Corp. This occurred through the operation of software and code on the Website.

**Defendant Shares Visitors' Data with at least 3 Data Brokers and 2 Social Media Companies**

17.    Defendant has partnered with at least three registered California data brokers, Criteo S.A., a French company ("Criteo"), Neustar, Inc. (a subsidiary of TransUnion) ("Neustar") and Quantcast Corporation ("Quantcast"), in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors. Defendant has done this by installing code and tools proprietary to Criteo, Neustar and Quantcast on the Website.

18.    Defendant has also partnered with numerous social media companies, including Meta and X Corp. (Twitter) in order to identify and track visitors to its Website for Defendant's benefit, as well as that of Meta and X Corp. and other companies, by installing code proprietary to these companies.

19.    The Criteo, Neustar and Quantcast code deployed on the Website is designed to track and correlate visitors by capturing electronic impulses transmitted from the devices of visitors to a website on which it is deployed. The process initiated by the Criteo, Neustar and Quantcast code identifies visitors through "browser fingerprinting." Fingerprinting allows data brokers like Criteo, Neustar and Quantcast to ascertain the identity of a website visitor by plotting hundreds of personal identifiers, including a user's geolocation, device information,

identification and cross-referencing of malicious cookies installed on their devices, and other traits evident from a user's browser.  The Meta and X Corp. code deployed on the Website work in similar ways, as described *infra*.

**Browser Fingerprinting**

20.     Why does it matter that data about a Website visitor such as the size of her screen, her device's brand name and her browser settings get transmitted to Criteo, Neustar, Quantcast, Meta and X Corp.?  One would think that the sharing of such seemingly non-personal data cannot impact a visitor's life or experience.  This assumption is simply incorrect.

21.     The fact is that when you visit a website, ***and before you get to weigh in on whether you should be targeted with ads or identified***, hundreds of non-personal data points tell those data brokers and social media companies who you are. (This data is *usually* combined with information such as the webpage you arrived from, and *sometimes* with information already in the hands of data brokers and social media companies including your name and email addresses, as well as other websites you have visited in the past.)

22.     As explained in an article in the October 2025 issue of *Wired Magazine*:

> Your browser fingerprint is a collection of innocuous information about your PC that, ***when put together, is unique enough that it could identify an individual***. Some of the components of your browser fingerprint include your computer's hardware, your browser and version, the various versions of software you have running in your browser, the fonts you have installed on your PC, your time zone, your system language, your keyboard layout; the list goes on. Out of the dozens of pieces of information, none of them could identify you

individually. It's when this data is bundled together that your fingerprint becomes unique.[1]

23.    The fingerprinting process works even when a visitor does not enter any items *colloquially referred to* as "personal data" – such as name, telephone number, address or email address – into a website.[2]

24.    In 2025, researchers at U.S. universities found evidence of the use of browser fingerprinting by websites, particularly in connection with advertising.[3] Through research, Dr. Yinzhi Cao, Associate Professor of Computer Science and Technical Director of the Information Security Institute at Johns Hopkins University, and other scholars, have "correlate[d] browser fingerprints and ad behaviors, essentially establishing the relationship between web tracking and fingerprinting."[4]

---

[1] Jacob Roach, "Here's What Your Browser Is Telling Everyone About You: Your browser sends a lot of information with each website you visit. That can be used to track you across the internet." (Wired Magazine, Oct. 16, 2025), available at https://www.wired.com/story/what-is-browser-fingerprinting/ (last viewed 2/22/2026).

[2] As discussed *infra*, in the privacy context, "personal information" can be used to refer to any information that can assist in identifying a person.

[3] Texas A&M Univ. Dep't of Computer Science and Engineering, "Websites Are Tracking You Via Browser Fingerprinting: New research provides the first evidence of the use of browser fingerprints for online tracking." (Texas A&M Stories June 26, 2025), available at https://stories.tamu.edu/news/2025/06/26/websites-are-tracking-you-via-browser-fingerprinting/ (last viewed 2/22/2026).

[4] *Id.*

### The Cycle of Third-Party Collection of Consumer Data and the Tracking of Consumers

25.    Collection of visitor data by entities such as Criteo, Neustar, Quantcast, Meta and X Corp. – including collection by these entities of unique identifiers that the Criteo, Neustar, Quantcast, Meta and X Corp. code assigns to visitors to the websites of advertising companies like S/L – enables ongoing tracking of website visitors as they visit new websites in the future.   At the same time, the tracking of a person's internet browsing going forward provides more opportunities for data collection (and profile building) about an individual. This cycle aids the advertising and/or data monetization efforts of Criteo, Neustar, Quantcast, Meta and X Corp. and similar organizations.

26.    As California Attorney General Rob Bonta explained in a 2022 California Superior Court complaint filed against retailer/website operator Sephora USA, Inc.:

> Consumers are constantly tracked when they go online.
> Sephora, like many online retailers, allows third-party
> companies to install tracking software on its website and
> in its app so that these third parties can monitor
> consumers as they shop. The third parties track all types
> of data; in Sephora's case, third parties can track whether
> a consumer is using a MacBook or a Dell, the brand of
> eyeliner that a consumer puts in their "shopping cart,"
> and even the precise location of the consumer. Some of
> these third-party companies create entire profiles of users
> who visit Sephora's website, which the third parties then
> use for Sephora's benefit. For example, the third party
> might provide detailed analytics information about
> Sephora's customers and provide that to Sephora, or offer

Sephora the opportunity to purchase online ads targeting specific consumers [ . . . ]. This data about consumers is frequently kept by companies and used for the benefit of other businesses, without the knowledge or consent of the consumer.

Complaint, *People of the State of California v. Sephora USA, Inc.*, CGC-22-601380, 2022 CA Sup. Ct. Pleadings LEXIS 38450 (Cal. Super. Ct., San Francisco Co., Aug. 24, 2022) (the "*Sephora* Complaint"), at 2:2-13.

### Registered California Data Brokers

27.     Data Brokers are companies whose core business is to collect, aggregate, analyze, and sell or license personal and non-personal data about individuals and organizations.  Data Brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

28.     Data Brokers gather information from a wide variety of sources, including by purchasing information from commercial sources like retailers, financial institutions, online marketplaces, subscription services, and loyalty programs.

29.     Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual.  The data is then cross-referenced and linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources.

30.     Data Brokers are accumulating data and profiling individuals to an alarming extent.  As the CEO of a Data Broker recently described the extent of their surveillance abilities as to an otherwise anonymous individual:  "We know who she is, what she watches, what she reads, and who she lives with.  [We] also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys.  We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the

SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation."[5]

31.    Given the amount of data available by way of the Data Brokers' practices, a company like Defendant has an incentive to partner with a Data Broker so that it can learn the identity of their website visitors in order to harass them with unwanted solicitations.

32.    Here, Defendant partnered with Criteo, Neustar and Quantcast, by installing Criteo, Neustar and Quantcast code onto the Website.  Defendant allows Criteo, Neustar and Quantcast, and possibly other Data Brokers, to access, use, and monetize the data provided by Defendant, in ways that remain undisclosed to the public.

**Criteo Code**

33.    Criteo was fined 40 million Euros by the French Data Protection Authority for breaches of European and French privacy regulations; the breaches entailed failure to obtain user consent.  Criteo specializes in retargeting consumers by utilizing JavaScript "Criteo One Tag" pixels on websites.  The Criteo code on the Website functions as follows:

34.    It places trackers or cookies on partner websites that a user visits. These trackers assign a unique identifier, called a Criteo ID, to the user's device. It collects other cookie IDs, the IP address, device ad IDs and user agent from the user's device.

35.    The Criteo code operating on the Website then logs browsing events by the user, including products viewed, timestamps (of events), purchases, page URLs

---

[5] Lucas Ropek, "Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users" (Gizmodo.com March 15, 2025), available at https://gizmodo.com/data-broker-brags-about-having-highly-detailed-personal-information-on-nearly-all-internet-users-2000575762 (last viewed 2/22/2026).

and referrer URLs. It also obtains customer relationship management (or CRM) data from website operators that have installed the Criteo code such as email hashes and offline sales.

36. Criteo seeks to identify the user – in the parlance of Data Brokers, "performs identity resolution" – by matching the information it receives from the user, whom the Criteo code and process can recognize across devices, with offline data.

37. The Criteo code conducts real-time interception of IP/cookie IDs and browsing events.

38. Plaintiff was subjected to the Criteo code as described *supra* starting when she requested that the Website load on her device on September 8, 2025.

**Neustar Code (the AGKN Tracker)**

39. Neustar is a software-as-a-service company that develops the AGKN Tracker, which it provides to website owners like Defendant for a fee. According to Neustar, the company "[t]ransform[s] omnichannel media performance with the next generation of identity-driven marketing capabilities." In other words, Neustar enables advertisers to identify and target specific people.

40. The first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the AGKN Tracker on the user's browser.

41. When the AGKN Tracker is triggered by a visit to a website, like Defendant's, it automatically causes a cookie to be downloaded onto the browser of visitor. The AGKN Tracker also instructs the user's browser to send Neustar the user's IP address and other device information to identify the user. TransUnion (Neustar's owner) then links a proprietary ID number to the dropped cookie and the visitor. This information is cross-referenced with other information collected by TransUnion to specifically identify the visitor and their device. Neustar/Transunion

adds this web-activity information to a larger profile of the visitor it already has. They do this to sell the profile (the data contained therein) for use in targeted marketing.

42.    The AGKN Tracker tracks individuals like Plaintiff and members of the putative Class as they navigate the internet, going from one website with the Neustar code to another.  It works in the following manner: After the cookie is dropped on the visitor's browser on one website, it is recognized by the AGKN Tracker on the other websites on which it is found, and when it is triggered.  Because the cookie – linked to a proprietary ID number – is associated with a profile of the visitor, the AGKN Tracker tracks the individual, not just the cookie.  TransUnion uses such individual cross-website-tracking data to build an increasingly detailed profile that touches upon the individual's beliefs, interests, and habits.

43.    It is estimated that as of August 2025, the AGKN Tracker has collected information on hundreds of billions of website interactions.

44.    Plaintiff was subjected to the Neustar code as described *supra* starting when she requested that the Website load on her device on September 8, 2025.

### Quantcast Code

45.     Quantcast is an advertising technology company that specializes in AI-driven real-time advertising, audience insights and measurements. According to their promotional materials Quantcast

> measures the heartbeat of your consumer across their
> digital journey, constantly changing based on our real-
> time pulse of the internet. We know the sites visited. The
> keywords searched. We understand purchase habits. We
> turn this data into actionable insight.

46.    Quantcast code operating on Defendant's website works in ways similar to the other Data Brokers.' It tracks individuals on an ongoing basis through

unique cookie IDs and other mechanisms that operate vis-à-vis visitors' browsers and devices. Quantcast assigns what it calls "online identifiers" to Website visitors, which it uses to create profiles of individuals.

47.     Quantcast shares its unique cookie IDs, associated with specific individual website visitors with other data brokers including Acxiom and Oracle so that all the identifiers each of the three companies have assigned can by synced.  In this way, Quantcast, Acxiom and Oracle 'share notes' to accurately identify individuals browsing the internet across sites.

48.     Quantcast incorporates data from visitors to a Website on which the Quantcast code is running into a dataset based on "millions of available data points" such as "pre-search behaviors, demographics, and past purchases."  Quantcast offers such insights about such visitors to website-operating companies such as Defendant.

49.     Plaintiff was subjected to the Quantcast code as described *supra* starting when she requested that the Website load on her device on September 8, 2025.

## The X Corp. Code

50.     X Corp has earned at least $1 billion each year through advertising annually in the past 5 years.  It maintains this revenue by collecting massive amounts of data about individuals navigating the internet, and identifying them.

51.     Defendant deploys the X Corp. code on the Website.  The Website is configured such that the X Corp. code starts running as the Website is starting to load on a visitor's screen.

52.     The X Corp. code initiates a sophisticated fingerprinting process that allows for the tracking of visitors without the use of traditional digital identifiers such as cookies. The X Corp. code process collects and combines multiple data points including device identifiers and configurations (such as installed fonts,

screen dimensions and system settings), browser identifiers and and network routing information to create a highly unique digital fingerprint.

53.    Each time a fingerprinted visitor, including Plaintiff and members of the putative class, encountered (and encounters) X Corp. code *embedded on websites other than S/L's*, the visitor is instantly recognized by X Corp. and X Corp.'s profile on the visitor is enhanced and updated.  The X Corp. code effectively generates surveillance trackers that enable comprehensive monitoring of visitors' online activities and creates detailed user behavioral profiles.

54.    Plaintiff was subjected to the X Corp. code as described *supra* starting when she requested that the Website load on her device on September 8, 2025.

### The Meta Code

55.    Meta is an advertising juggernaut, with its Facebook and Instagram platforms earning jointly well over $100 billion annually in ad revenue.

56.    Defendant employs Meta code on the Website. The Meta code causes third party cookies to be transmitted to and from Website visitors' browsers and devices to the Facebook domain.  That domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral analysis, user retargeting, and analytics.[6] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps. As discussed above, Defendant has approximately 300 social media marketing campaigns running on Meta's platforms. *See* Exhibit A hereto.

57.    The cookies dropped by the Meta code cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring

---

[6] https://www.facebook.com/privacy/policies/cookies/ (last visited 2/27/2026).

URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses) – including whether a user is located in California.

58.   By identifying users who have shown interest in certain products or content, the Facebook-domain cookies cause Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[7]  These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[8]

59.   Meta uses the data it receives through the Facebook-domain cookies to tailor content and target marketing to users including the following practices: (a) Ad Targeting and Retargeting, allowing Meta to build a profile of individuals based on their behavior on different websites, comprised of their browsing habits, purchases and interactions; and (b) Cross-Device and Cross-Platform Tracking, which allows Meta to track users across devices and social media platforms, so that ads are targeted consistently regardless of the device an individual is using.

60.   Plaintiff was subjected to the Meta code as described *supra* starting when she requested that the Website load on her device on September 8, 2025.

### Troubling Implications of Third-Party Data Sharing

61.   Companies using third-party tracking software – such as the Criteo, Neustar, Quantcast, Meta and X Corp. code described above – often seek to downplay its significance. They emphasize that the data collected by such software is being used simply to inform consumers about products they believe would be particularly appealing to them.  However, there is no guarantee that consumer data

---

[7] *See id;* https://allaboutcookies.org/what-data-does-facebook-collect (last visited 2/23/2026).

[8] *See id.*

supplied to Data Brokers or social media platforms will be used solely for advertising purposes.

62.    As Data Brokers, Criteo, Neustar and Quantcast can use data it received regarding Plaintiff's visit to the Website to further profile Plaintiff, with the objective of monetizing this data by selling or licensing it to other entities, including law enforcement and government agencies.

63.    A recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase personal data to further their exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force."[9]

64.    There are recent examples of tech companies exchanging information with the federal government in ways that threaten civil liberties and individuals with minority viewpoints. For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected noncitizens.[10]

65.    Another example of such government data exchange is the provision by Meta, pursuant to valid warrants, of user data such as Facebook messages, for the purpose of investigating and prosecuting state crimes related to abortion.[11]

66.    This month, Google handed over user data to the United States Department of Homeland Security ("DHS" or "Homeland Security") based on an

---

[9] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole

[10] https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/ (last visited 2/6/2026).

[11] https://www.nbcnews.com/tech/tech-news/facebook-turned-chat-messages-mother-daughter-now-charged-abortion-rcna42185 (last visited 2/6/2026).

administrative subpoena for the investigation of an individual based on the fact that he had written to a DHS attorney advocating on behalf of a refugee from Afghanistan in deportation proceedings.[12]  No clear legal authority exists preventing the sale or dissemination of user data by Data Brokers to the federal government.

67.    The New York Times reported on February 13, 2026, "Homeland Security is said to have sent Google and Meta hundreds of subpoenas for information to identify Americans who oppose ICE. Tech companies received legal requests for the names, email addresses, telephone numbers and other identifying data behind social media accounts that track or criticize the agency."[13]

68.    As Attorney General Bonta explained in the *Sephora* case:

> The ramifications of this third-party surveillance can go beyond ordinary consumer profiling. Sephora's website allows visitors to browse and purchase products such as prenatal and menopause support vitamins—data points which can be used by third-party companies to infer conclusions about women's health conditions, like pregnancy. Moreover, when a company like Sephora utilizes third-party tracking technology without alerting consumers and giving them the opportunity to control

---

[12] https://newrepublic.com/post/206088/homeland-security-67-year-old-us-citizen-criticized-email (last visited 2/8/2026).

[13] *Homeland Security Wants Social Media Sites to Expose Anti-ICE Accounts* (N.Y. Times Feb. 13, 2026), available at

https://www.nytimes.com/2026/02/13/technology/dhs-anti-ice-social-media.html (last visited 2/25/2026).

1  their data, they deprive consumers of the ability to limit

2  the proliferation of their data on the web.

3  *Sephora* Complaint, at 2:14-20.

### Data and Related Profiles of Consumers Have Economic Value

4

5  69.    The type of visitor data transmitted via the Website to Criteo, Neustar,

6  Quantcast, Meta and X Corp. have economic value – as it obvious from the facts that

7  these third parties create code to collect it, and that Defendant has installed the code

8  on the Website.  The value of this data – that of Plaintiff as well as that of members

9  of the Class on whose behalf Plaintiff has filed this action – was diminished by

10  Defendant's deployment of the Criteo, Neustar, Quantcast, Meta and X Corp. code

11  on the Website.

12  70.    The loss of anonymity that occurs through the type of visitor browser

13  fingerprinting and subsequent tracking alleged herein imposes real costs on visitors

to Defendant's Website, including Plaintiff and Class members.  For example, in

15  2025, the Federal Trade Commission found that many websites use data such as

16  "consumers' characteristics and behaviors, like location, demographics, browsing

17  patterns and shopping history" to tailor consumer pricing.[14]

18  71.    As recently explained by the Law Institute:[15]

19  In the modern economy, identity information has been

20  described as the business of buying and selling

21

22  [14] *See* https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-

23  surveillance-pricing-study-indicates-wide-range-personal-data-used-set-

24  individualized-consumer (U.S. Federal Trade Commission Jan. 17, 2025) (last

25  visited 2/23/2026).

26  [15] https://thelaw.institute/cyberspace-technology-and-social-issues/identity-value-

27  modern-economy/ (The Law Institute (Updated) Oct. 27, 2025) (last visited

28  2/23/2026).

information as a commodity. Unlike traditional physical commodities, personal data is intangible yet holds immense economic value. The transformation of identity into a tradeable asset has occurred gradually as technologies for collecting and analyzing personal information have become increasingly sophisticated. [ . . . ] Personal identity in the digital realm comprises multiple elements. Demographic information includes age, gender, location, income levels, and educational background. Behavioral data tracks online activities such as websites visited, products viewed, and time spent on particular pages. Transaction histories reveal purchasing patterns, payment methods, and brand preferences. Location data from smartphones and wearable devices provides real-time information about movements and habits. What makes identity information particularly valuable is its predictive power. By analyzing past behaviors and preferences, companies can anticipate future actions with remarkable accuracy. This ability to forecast consumer behavior translates directly into competitive advantages in marketing and product development. A complex ecosystem has emerged around the collection and trading of identity information. This marketplace operates largely invisibly to average consumers, yet it powers much of the modern digital economy. The global data brokerage industry was valued at approximately $270.4 billion in 2024, with projections indicating growth to $473.35 billion by 2032.  [ . . . ]

1   Advertisers and marketers purchase identity information
2   to target specific consumer segments with tailored
3   messages. Behavioral advertising uses internet cookies
4   and tracking technologies to understand browsing
5   tendencies and create defined audience segments. This
6   allows companies to place advertisements in front of
7   consumers most likely to respond positively.

8       72.    There exists an established market for the type of personal data
9   collected through the Criteo, Neustar, Quantcast, Meta and X Corp. code running on
10  the Website: data that facilitates the creation and enhancement of consumer profiles
11  for individuals, and ongoing tracking of individuals' internet browsing. Defendant's
12  surreptitious and unlawful transfer of personal information through the code on its
13  Website diminished Plaintiff's and Class members' ability to participate in that
    market on informed terms, including to exercise the choice of whether to withhold,
15  limit, or exchange their personal data for value.

16                          **CLASS ALLEGATIONS**

17      73.    Plaintiff brings this action individually and on behalf of all others
18  similarly situation (the "Class") defined as follows:

19          **All persons who, while located in California, visited the**
20          **Website during the applicable limitations period, and were**
21          **subjected to the operation of one or more of the Criteo,**
22          **Neustar, Quantcast, Meta and X Corp. code running on the**
23          **Website.**

24      74.    This action has been brought and may be properly maintained as a class
25  action. There is a well-defined community of interest in the litigation and the
26  proposed class is ascertainable.

27
28

75. NUMEROSITY: Plaintiff does not know the number of Class members but believes the number to be in the thousands, if not more. The exact identities of Class members may be ascertained by the records maintained by Defendant.

76. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

       a. Whether Defendant's actions violate California common or statutory law;

       b. Whether Plaintiff and Class members are entitled to statutory damages;

       c. Whether Plaintiff and Class members are entitled to punitive damages;

       d. Whether Plaintiff and Class members are entitled to injunctive relief;

       e. Whether Plaintiff and Class members are entitled to the disgorgement of unlawfully obtained data; and

       f. Whether Plaintiff and Class members are entitled to the disgorgement of profits.

77. TYPICALITY: Plaintiff was subjected to the Criteo, Neustar, Quantcast, Meta and X Corp. running on the Website when she visited the Website on September 8, 2025. As a result, her data was transmitted to Criteo, Neustar, Quantcast, Meta and X Corp., and possibly other third parties, for fingerprinting and tracking purposes. Her claims are therefore typical of the Class.

78. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class

action litigation.   All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

79.   SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class member is impracticable and inefficient.  Even if every Class member could afford individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

## FIRST CAUSE OF ACTION

### Violations of California Trap and Trace Law

### Cal. Penal Code § 638.51 (the "California Trap and Trace Law")

80.   Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

81.   The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

82.   A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."  Id. § 638.50(c).

83.   Each of the Criteo, Neustar, Quantcast, Meta and X Corp. code, as deployed on the Website, constitutes a trap and trace device under Cal. Penal Code § 638.50(c).

84.   The "electronic communication" at issue in this case is the communication between the devices of Plaintiff and the Class members, on the one hand, and the Website, an instrumentality of Defendant, on the other hand.

"Electronic communication" is defined under CIPA as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system." A visit to a website entails the transfer of signals and data, or "intelligence of any nature" by a "wire, radio [or] electromagnetic [ . . . ] system." Cal. Penal Code § 629.51(a)(2). The interactions of Plaintiff and Class members with the Website meet this definition.

85.    Each of the Criteo, Neustar, Quantcast, Meta and X Corp. code is designed to identify to a reasonably likely degree the source of the electronic communications between the devices of Plaintiff and Class members, on the one hand, and the Website, on the other, by 'capturing' the electronic or other impulses emanating from the devices that are "incoming" to the Website. The "**sources**" of the electronic communications moving from the devices to the Website are ***Plaintiff and the Class members (including their devices)***.

86.    Software or code running on websites that "captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication" constitutes a trap and trace device under §§ 638.50-51. See, e.g., Alex & Ani, LLC, 2026 LX 10546, at *4-7 (C.D. Cal. Jan. 20, 2026); Casillas v. Six Flags Ent. Corp., 2025 LX 518344, at *21-22 (C.D. Cal. Dec. 15, 2025); Lewis v. Magnite, Inc., 2025 LX 509487, at *39-42 (C.D. Cal. Dec. 4, 2025); Garon v. Keleops USA, Inc., 2025 LX 383838, at *10-15 (N.D. Cal. Sep. 2, 2025); Riganian v. LiveRamp Holdings, Inc., 791 F.Supp.3d 1075, 1093-1094 (N.D. Cal. July 18, 2025); Gabrielli v. Motorola Mobility LLC, 2025 U.S. Dist. LEXIS 133836, at *30-32 (N.D. Cal. July 14, 2025); Heiting v. Fka Distrib. Co., 2025 U.S. Dist. LEXIS 20076, at *8 (C.D. Cal. Feb. 3, 2025); Conohan v. Rad Power Bikes Inc., 2025 U.S. Dist. LEXIS 72865, 2025 WL 1111246, at *16 (C.D. Cal. Apr. 3, 2025); Mirmalek v. Los Angeles Times

Commc'ns LLC, 2024 U.S. Dist. LEXIS 227378, at *6-10 (N.D. Cal. Dec. 12, 2024); Shah v. Fandom, Inc., 754 F. Supp. 3d 924, 930-931 (N.D. Cal. October 21, 2024);  Moody v. C2 Educ. Sys. Inc., 742 F. Supp. 3d 1072, 1076-1077 (C.D. Cal. July 25, 2024).

87.    Defendant did not obtain a court order before using or installing each of the Criteo, Neustar, Quantcast, Meta and X Corp. code on the Website.  Defendant also did not obtain consent from Plaintiff or any of the Class Members before using this technology, which is designed to reasonably likely identify Plaintiff and the Class members, along with their devices, as the source of electronic communications between them, on the one hand, and the Website, an instrumentality of Defendant, on the other hand.

88.    Defendant did not obtain the express or implied consent of Plaintiff or Class members to be subjected to data-sharing or data-selling with or by or through Criteo, Neustar, Quantcast, Meta and X Corp. Indeed, Plaintiff and the Class members expressly opted out of such data-sharing or data-selling through the consent interface on the Website.

89.    Defendant is ineligible for the statutory consent exemption from liability for use of a trap and trace device set forth in Cal. Penal Code § 638.51(b)(5). The § 638.51(b)(5) consent exemption is available only to a "provider of electronic or wire communication service."  Defendant is not such a provider.

90.    CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; see also Fandom, 754 F. Supp. 3d at 932; C2 Educ. Sys. Inc., 742 F. Supp. 3d at 1077-78.

91.    Plaintiff and Class members are entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51.

92.

## SECOND CAUSE OF ACTION

### Intrusion Upon Seclusion

94.   Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

95.   Under California law, a defendant is liable for intrusion upon seclusion when it intentionally intrudes into a private place, conversation, or matter in a manner that would be highly offensive to a reasonable person.

96.   Defendant's deployment of Criteo, Neustar, Quantcast, Meta and X Corp. code on the Website intentionally intruded into a private conversation or matter Plaintiff and the Class members were involved in – namely their visit to the Website.  The intrusion allowed Criteo, Neustar, Quantcast, Meta and X Corp. to identify, profile and track (on an ongoing basis) Plaintiff and Class members.

97.   Plaintiff and the Class members never authorized the third-party cookies and other tracking technology initiated by the Criteo, Neustar, Quantcast, Meta and X Corp. code on the Website.

98.   Plaintiff and Class members had an objectively reasonable expectation of privacy with respect to their conversation or exchange with Defendant over the Website, particularly in light of the fact that the Website relates to clothing sales. Plaintiff's choice of clothing and clothing size (including waist size) reveals information that a reasonable person would not want shared or sold third parties who, in turn, could sell it to other third parties.

99.   Defendant's intrusion into Plaintiff's and Class members' visits to the Website was intentional, in that it involved deployment of software and configuration of the Website.  Further, it was perpetrated for Defendant's economic benefit.

100.  The intrusion described herein would be highly offensive to a reasonable person because it relates to information concerning his or her body and clothing size, information that she would not want to be shared across the internet.

101.   Defendant's invasion of the privacy of Plaintiff and Class members damaged them and they are there entitled to compensatory damages, which includes monetary damages.

102.   Plaintiff and Class members are entitled additionally to punitive damages because Defendant's use of the Criteo, Neustar, Quantcast, Meta and X Corp. code on the Website was malicious, oppressive and willful. That use includes both the installation of the code and the configuration of the Website to bypass what Plaintiff and the Class members believed were their decisions to stop all data-sharing and data-selling by the Website.  Defendant's actions were made in conscious disregard of the choice made by Plaintiff and the Class members to stop the sharing with and selling to third parties of their personal data.

103.   Plaintiff and Class members are entitled additionally to equitable relief in the form of enjoining Defendant from continuing to engage in its unlawful conduct, and disgorgement of profits earned by Defendant from its invasion of their privacy interests.

## **PRAYER**

WHEREFORE, Plaintiff, on her behalf and on behalf of the Class members, prays for the following relief against Defendant:

1.      An order certifying the Class, naming Plaintiff as the representative of the Class and appointing Plaintiff's attorneys as Class Counsel;

2.      An award of statutory damages pursuant to CIPA;

3.      An award of punitive damages;

4.      An award of nominal damages;

5.      An order for full restitution;

6.      An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

7.      An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

8.      Reasonable attorneys' fees and costs; and

9.      All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

DATED: March 2, 2026                    TAULER SMITH LLP


                                        By:  _/s/ J. Evan Shapiro_____
                                              J. Evan Shapiro, Esq.

                                        *Attorneys for Plaintiff Elizabeth Haviland*

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.


DATED: March 2, 2026                    TAULER SMITH LLP


                                        By:  _/s/ J. Evan Shapiro_____
                                           J. Evan Shapiro, Esq.

                                        *Attorneys for Plaintiff Elizabeth*
                                        *Haviland*